# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**TRACEY E. BOGLE**,

       Plaintiff,

    v.

**CLACKAMAS COUNTY**, *et al.*,

       Defendants.

Case No. 3:15-cv-0013-SI

**OPINION AND ORDER**

Tracey E. Bogle. 8652169, Santiam Correctional Institution, 4005 Aumsville Highway SE, Salem, OR 97317. Plaintiff, *pro se.*

Stephen L. Madkour, County Counsel, Scott C. Ciecko, Assistant County Counsel, Office of Clackamas County, Public Services Building, 2015 Kaen Road, Oregon City, OR 97045 Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

       Plaintiff Tracey E. Bogle ("Bogle") brings this action against the County of Clackamas,

Oregon ("Clackamas County"); Craig Roberts, Sheriff of Clackamas County ("Sheriff Roberts"),

personally; and against Clackamas County Sheriff's Deputies Brad O'Neil ("O'Neil"), Hilary

Robinson ("Robinson"), and Eric McGlothin ("McGlothin"), personally (collectively,

"Defendants"). Bogle asserts claims under 42 U.S.C. § 1983 ("§ 1983"), alleging that Defendants

subjected Bogle to excessive force in violation of the Fourth Amendment, made applicable to

state and local governments by the Fourteenth Amendment. Before the Court is Defendants'

motion for summary judgment. For the reasons stated below, Defendants' motion is granted.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 252, 255 (1986). "A party asserting that a fact cannot be true or is genuinely disputed

must support the assertion with admissible evidence." *Jakeman v. Berry*, 2015 WL 2062344,

at *3 (D. Or. Apr. 6, 2015). "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

It is the responsibility of the non-moving party to "set forth specific facts showing that

there is a genuine issue for trial." *Keiffer v. Pernsteiner*, 967 F.2d 527 (9th Cir. 1992). In order

for a party to avoid summary judgment, such facts must be supported by "citing to particular

parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or

other materials." Fed R. Civ. P. 56(c)(1)(A). Where an affidavit or declaration is relied on to

oppose a summary judgment motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed R. Civ. P. 56(c)(4). Where the party opposing summary judgment is proceeding *pro se*, the court "must consider as evidence . . . all of [that party's] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

## BACKGROUND

On April 10, 2013, Bobby Ottis, a Marion County Probation Officer, called Clackamas County dispatch asking for assistance in executing a felony arrest warrant for Tracey E. Bogle for violating his probation. Mr. Ottis believed that Bogle was staying in Eagle Creek, Oregon, in Clackamas County.

Mr. Ottis provided dispatch with the following additional information: Bogle was on probation for felony burglary and misdemeanor assault; he was an "armed career criminal [and a] sex offender"; he had been in possession of a gun before; and he had recently stated: "If I go to prison, I'll die." ECF 131-1 at 1. Mr. Ottis also warned that Bogle was "a big boy," probably weighing about 285 pounds and standing about five feet, ten inches tall, with a 56-inch chest, and that he had lifted weights while in prison. ECF 131-1 at 1; 132-2 at 4. Dispatch in turn informed the responding deputies from the Clackamas County Sheriff's Office ("CCSO") of these background facts. The deputies also received information about Bogle through the Law Enforcement Data System ("LEDS"), which revealed his extensive criminal history, including multiple violent offenses. *See, e.g.*, ECF 129 at 2. After this point, some details of the encounter

and arrest are disputed. Because this is a motion for summary judgment, the Court views the facts in the light most favorable to and draws all reasonable inferences in favor of Bogle.

On the afternoon of April 10, 2013, Tracey Bogle was at the home of his girlfriend, Debbie Ridley. At the time, he did not know that there was a warrant out for his arrest. Bogle was working outside behind Ms. Ridley's property in a steep, densely wooded area above a creek. Ms. Ridley had just recently arrived home, and did not know whether Bogle was at the property. Bogle's car was in the driveway, but he occasionally left his car there when he was not on the property. Robinson, McGlothin, and Sergeant Steve Strickland (collectively, the "Responding Deputies")[1] arrived on the scene. Ms. Ridley agreed to let them search the property for Bogle.

The Responding Deputies searched the house and some of the surrounding area, but did not locate Bogle. One deputy talked to some neighbors, who indicated that they had seen Bogle outside only a few minutes earlier. The Responding Deputies then spotted a man's sweatshirt on the back deck, and suspected that Bogle had in fact been there. According to the Responding Deputies, after another search of the property, they jointly decided to deploy a police canine to search for Bogle. Robinson gave a warning, calling "Tracey" by name and stating that if he did not surrender, a canine would be released and would bite him. Robinson then spotted Bogle in the wooded area behind the house, moving away from the Responding Deputies.

While Bogle was doing landscaping work in the ravine, he heard his dogs at the house barking in an "unusual" way and faintly heard a woman's voice call his name. He did not respond, and instead waited and listened. He then found himself being attacked by a police dog.

_____

[1] O'Neil and his canine arrived on the scene later, after the initial Responding Deputies could not locate Bogle. The parties are not specific as to precisely when O'Neil arrived. Because the exact details of which deputies were present for each specific fact are not material, O'Neil is also included in the Court's general references to the "Responding Deputies."

He tried to protect himself by grabbing the dog's harness. The dog managed to bite him, tearing the back-right pocket on Bogle's jeans. This caused Bogle to fall about 30 feet down the steep hill into the creek area below, injuring his leg.

At that point, Bogle saw McGlothin and a second police dog about twenty feet away from him. McGlothin shouted "freeze or I'll release another dog." Bogle asked McGlothin whether this was for Bogle's probation violation, and stated that he was not a threat to the deputy. At that point, McGlothin gave a command to his dog, which then bit Bogle in the forearm. Bogle resisted, but the dog continued to bite him, eventually holding on to Bogle's upper arm. McGlothin ordered Bogle to get down, and Bogle got down on his knees but refused to go any further, explaining that because they were in a creek, if he got down all the way he would be under water. McGlothin then called his dog off of Bogle and placed Bogle in handcuffs. At some point during this encounter, Robinson hit Bogle with her knee in his back, pushing him down into the ground. Afterward, the deputies took the handcuffs off of Bogle so that he could make the steep climb back up toward Ms. Ridley's house. Emergency medical technicians examined Bogle, and the deputies ultimately transported him first to a hospital and later to the Clackamas County Jail.

Bogle sustained several injuries in the course of his arrest. He injured his leg in the fall and still suffers from a "crippling limp."[2] Additionally, he suffered several scratches and cuts from the fall and the canine bites on his arm and back, which resulted in swelling in his arm.[3]

_____

[2] Bogle states that he fractured or broke his "upper fibula" or "cranial fibula." He provides no medical evidence, however, to support this claim, and he, as a lay person, is not qualified to diagnose this type of injury. The Court assumes for purposes of this motion that Bogle suffered a leg injury, and that it caused him significant pain and discomfort.

[3] Bogle claims that these cuts resulted in an infection, but cites no evidence to support that claim. His medical record from the hospital visit reads: "Numerous scratches throughout on his right upper extremity, he has several abrasions. No actual punctures. He does have some

Bogle states that he still experiences numbness and dysfunction in his arm, in addition to having scars from the wounds.

Bogle claims in his response to Defendants' motion for summary judgment that he was left to "bleed out his wounds for 24 hours with no bed." He acknowledged in his deposition on November 17, 2015, however, that medical staff at the hospital bandaged his wounds and that he went to the hospital before being taken to county jail for the night.[4] The Court notes that Bogle has not asserted any Eighth Amendment violation and Bogle's recitation of facts relating to the treatment of his injuries at the hospital can only be considered if relevant to his § 1983 claim of excessive force.

---

contusions where the dog appeared to have bitten him. It is more indentations and superficial breaks in the skin. There is no actual discrete puncture or laceration. Likewise on the upper arm he has several superficial abrasions that are linear and appear consistent with dog bites. There was only 1 area that is actually a laceration. It is approximately 1 cm in length. It is at the end of one of the abrasions."

[4] Bogle also suggests in his deposition testimony that deputies attempted to cover up his injuries by preventing him from receiving stiches. Bogle has provided no admissible, competent, evidence to support this claim. The record from Providence Willamette Falls Medical Center, to which Bogle cites, indicates that stitches were "not warranted." The Court has reviewed photos of Bogle's injuries, and they are not of the sort that would make it obvious to a lay person that stitches were required—even if, as Bogle argues, nurses cleaned his wounds before the photographs were taken. Therefore, Bogle is not competent to testify that his wounds needed stitches that were not provided.

The record of Bogle's hospital visit further indicates that he "was given Augmentin coverage, Percocet for pain, prescribed 5 more days of Augmentin for antibiotic prophylaxis, advised to return for new, worsening, or concerning symptoms and/or follow up with the primary as doctor as needed." Bogle states that this is a lie—that he was not provided with a prescription for antibiotics or "other medical remedies" and that he "never received any such medical care from them." Bogle also stated in his sworn deposition, however, that a nurse "snuck" a painkiller to him, which he took.

**DISCUSSION**

**A. Standards for a Claim of Excessive Force**

A "claim of excessive force in the course of making a seizure of the person is properly analyzed under the Fourth Amendment's objective reasonableness standard." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)) (quotation marks and corrections omitted). To determine the reasonableness of a seizure, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

The Ninth Circuit has outlined a three-step process for analyzing a claim of excessive force under the Fourth Amendment. "The first step of the excessive force inquiry requires us to assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (quotation marks omitted). The second step is "to evaluate the government's interest in the use of force." *Id*. at 1257. The government's interest is measured by three main factors:

> (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

*Id*. (quotation marks omitted); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989). These factors are "not exclusive," however, and courts should "examine the totality of the circumstances, considering other factors when appropriate." *Lowry*, 858 F.3d at 1257. Such other factors include, for example, "whether proper warnings were given and the availability of less intrusive alternatives to the force employed." *Id*. at 1259 (quotation marks omitted). The third and final step, as articulated by the Ninth Circuit, requires courts to "balance the gravity of the

intrusion on [the individual's] Fourth Amendment rights against the [government's] need for that intrusion." *Id*. at 1260.

The objective reasonableness test is necessarily fact-dependent. The relevant factors "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. As the Supreme Court has recognized, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and thus "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396 (citations and quotation marks omitted).

The Ninth Circuit has "held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly," because "the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). If, however, there are "no genuine issues of material fact and 'the relevant set of facts' has been determined, the reasonableness of the use of force is 'a pure question of law.'" *Lowry*, 858 F.3d at 1256 (quoting *Scott*, 550 U.S. at 381 n.8).

**B. Alleged Force Used Against Bogle**

Bogle claims he was subjected to three different uses of force during his arrest: first, the bite on his backside which caused him to fall; second, the bites on his arm when McGlothin commanded his dog to bite Bogle; and third, Robinson's force against Bogle's back. The Court analyzes each separately, although the Court first discusses in greater detail the facts and law relating to the use of canines.

## 1. Bogle's Encounters with Police Dogs

There is factual dispute regarding how many police dogs Bogle came into contact with during his arrest, and who was responsible for those dogs. Defendants maintain that Bogle had only one encounter with a police dog, McGlothin's. O'Neil also deployed his canine (*i.e.*, took his canine out of his vehicle and onto the property with him),[5] but states that he maintained control of the canine at all times and that neither he nor his canine came into contact with Bogle.[6] Bogle, on the other hand, claims that he had two encounters with police dogs, which he believes were two different dogs. One encounter was before Bogle fell and one was after he fell. The second police dog was standing near and commanded by McGlothin. While Bogle does not have personal knowledge of which canine belonged to which deputy, Bogle asserts that he saw a dog with McGlothin immediately after Bogle's fall, which was caused by a canine. Bogle notes that a dog could not have made it from where Bogle originally was located, before he fell, to where McGlothin and his dog were located after Bogle's fall in the time it took Bogle to fall to the second location.

The Court assumes for purposes of the pending motion that Bogle had two contacts with one or more police canines. It is irrelevant whose canine was involved in the first contact, because Defendants O'Neil, McGlothin, and Robinson jointly decided to use police canines to search for Bogle. Thus, they are all jointly responsible for the first canine bite.[7]

---

[5] *See* ECF 198-1 at 80 ("Deploying and releasing on a person are separate. Whenever our dogs get out of the car to go and do work, whether it be a search for a person or just be on standby in case they're needed, that's a deployment.")

[6] Although Robinson is also a canine deputy, she did not bring her canine out of the vehicle—a fact that Bogle does not dispute.

[7] In his response to Defendants' motion for summary judgment, Bogle appears to be arguing a claim against O'Neil for supervisory liability for the canine bites sustained by Bogle. No such claim, however, is alleged in Bogle's complaint. Bogle's complaint alleges supervisory

### a. First Canine Bite

With each application of force, the first step is to evaluate the type and amount of force inflicted on the plaintiff. *Lowry*, 858 F.3d at 1256-57. Bogle asserts that the use of a police canine to locate and hold a suspect constitutes "lethal force." Ninth Circuit precedent, however "establishes that characterizing the quantum of force used with regard to the use of a police dog depends on the specific factual circumstances." *Id*. Therefore, the Court must analyze each use of the canine, or bite, to characterize its level of force.

The Ninth Circuit recently summarized some of its precedent on the use of police canines:

> In *Smith v. City of Hemet*, 394 F.3d 689, 701-02 (9th Cir. 2005) (en banc), we held that the use of a police dog constituted excessive force where the officers sicced the dog on the plaintiff three times, including once after he had already been pinned down, and then pepper sprayed his open wounds. Similarly, in *Chew* [*v. Gates*], we concluded that "the force used to arrest [the plaintiff] was severe" because the dog bit the plaintiff three times, dragged him between four and ten feet, and "nearly severed" his arm. 27 F.3d at 1441. On the other hand, in *Miller v. Clark County*, we held that the use of force, although considerable and serious, was nonetheless reasonable and did not rise to the level of "deadly force," even though the dog apprehended a fleeing suspect with a bite that lasted between forty-five and sixty seconds, "shredded" the plaintiff's muscles, and reached the bone. 340 F.3d at 961-66.

---

liability for the canine unit against Sergeant Paul Coleman, but that claim was dismissed. *See* ECF 115. Bogle may not add a new claim in response to Defendants' summary judgment motion. *See Wasco Prods. Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("'[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.'") (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)). Even if he could add such a claim, Bogle merely asserts, in a conclusory manner, in various portions of his response that O'Neil had supervisory authority over the canine deputies. Bogle has no basis for personal knowledge of this fact, however, and provides no evidence to support it. He cites O'Neil's deposition from August 29, 2017. In that deposition, O'Neil was asked whether he had any supervisory duties at the time of Bogle's arrest, and O'Neil responded that he did not (at the time of his *deposition*, however, O'Neil was a supervisor). According to O'Neil, at the time of Bogle's arrest, Sergeant Coleman was the supervisor. As noted, Seargeant Coleman is no longer a defendant in this case.

*Lowry*, 858 F.3d at 1256-57 (first alteration added, second alteration in original). Considering both the "risk of harm posed by [the] particular use of force, and the actual harm caused," the Ninth Circuit in *Lowry* found that the district court had properly characterized the use of a canine as "moderate" where the officer followed closely behind the canine and called it off of the plaintiff "very quickly after the initial contact" upon finding that the plaintiff was not a threat (and in fact was asleep). *Id*. at 1257.

Here, considering the risk of harm and the actual harm caused in having a police dog search the woods for Bogle upon the Responding Deputies' arrival and inability to locate Bogle, the Court finds the use of force to be moderate. The risk of harm to Bogle was that the dog would bite and hold Bogle until a deputy arrived. Clackamas County canines are trained to bite and hold persons until deputies arrive, and to inflict the least amount of physical injury possible to the person. The risk of harm did not foreseeably involve Bogle himself falling and injuring his leg, though this was the actual harm caused.[8] The force used in this encounter was less severe than the force deployed in *Smith* and *Chew*. The Court finds that, under the circumstances, the force used in this encounter with Bogle was moderate.

The next step is to determine the government's interest in securing Bogle's arrest. Applying the three-factor test from *Graham v. Connor*, the first factor to be considered is the severity of the crime for which Bogle was sought. Bogle was wanted for violating his probation, based on his underlying crimes of felony burglary and misdemeanor assault. Bogle argues that

---

[8] Bogle argues that the deputies acted contrary to Clackamas County's canine use of force policy, which states that "[c]anines shall always be on lead when on an elevated area from which a fall could be hazardous . . . ." ECF 198-2 at 175. He suggests that his fall was the sort of hazard sought to be prevented by this policy. Multiple deputies stated in their depositions, however, that this aspect of the policy was intended to protect the canines, not humans, from falls. The Responding Deputies determined that the terrain did not pose a hazardous fall condition to the dogs. Moreover, the Responding Deputies determined that keeping the dogs on leash under the circumstances was not feasible.

his original parole violation in and of itself—drinking alcohol—was minor, and therefore that the officers' use of force to arrest him was unreasonable. Although Bogle is correct that drinking alcohol in violation of parole conditions is itself a minor transgression, Bogle was actually being sought because Mr. Ottis reported that he was "wanted," that there was a "felony warrant out for him," and that he was "not living where he was supposed to be living" while on probation. ECF 132-2 at 2-4. There is some support for Bogle's argument that this, while resulting in a "felony warrant," as the deputies point out, does not qualify as a serious offense. *See Jones v. Pierce County*, 2014 WL 4409608, at *3 (W.D. Wash. Sept. 8, 2014) ("Jones was wanted for failing to report to probation. He was allowed to serve his sentence for the underlying offense in the community presumably because he was not a threat to the public . . . a reasonable jury could conclude that the severity of the crime and situation does not support [the officer's] use of force."); *see also Tennessee v. Garner*, 471 U.S. 1, 14 (1985) ("[W]hile in earlier times the gulf between felonies and the minor offences was broad and deep, today the distinction is minor and often arbitrary." (citation and quotation marks omitted)). The perspective of the deputies on the scene, however, was based on what they learned from Mr. Ottis: that Bogle had "taken off" from Mr. Ottis, was "possibly hiding" at Ms. Ridley's house, was an armed career criminal, felt he would "die" if he went back to prison, had a history of violent offenses, and had at one time been in possession of a gun. Thus, although this factor does not weigh heavily in either direction, it tips slightly in favor of Defendants.

The second factor, whether the suspect posed a threat to the safety of the officers, also weighs in favor of the Defendants in this case. Before deciding to release a canine, the Responding Deputies were aware, based on Mr. Ottis' warnings, that Bogle had been in possession of a gun in the past, that he was an "armed career criminal" and a sex offender, and

that he had a history of violent criminal activities. Mr. Ottis also warned the deputies that Bogle was a large, strong, person, who was determined to avoid going back to prison.[9] No responding deputy had the opportunity to search Bogle for weapons. Bogle suggests that the Responding Deputies knew he was not armed or dangerous because his girlfriend, Ms. Ridley, told them as much. But from the perspective of an officer on the scene, it was reasonable to choose to rely on the statement of Mr. Ottis, a fellow law enforcement officer, and to approach the situation with caution. Additionally, the Responding Deputies reasonably believed that Bogle was familiar with the area because he had been staying there with his girlfriend, while they were not.[10] This led the Responding Deputies to believe that Bogle had a strategic advantage over them, and to fear that he could ambush them, set traps, or hide weapons in the densely wooded, uneven terrain. Thus, the second factor weighs in favor of Defendants.

The final of the *Graham* factors, whether the suspect is attempting to resist or evade arrest, also weighs in favor of the Responding Deputies. Bogle asserts that he was not trying to hide from the deputies—that he was simply working outside behind Ms. Ridley's house, did not know that he was being sought, and did not hear any canine warning. But once again, the

---

[9] Bogle devotes significant time to arguing that Mr. Ottis' representations—upon which the Responding Deputies relied in deciding how to approach the scene—were false or exaggerated. For purposes of evaluating the Responding Deputies' decisions, however, the important question is not whether those statements were correct, but rather what information the deputies reasonably believed at the time, and whether the actions they took in reliance on those statements were themselves reasonable.

[10] Bogle argues that because the Responding Deputies worked in the county encompassing Ms. Ridley's property, which was surrounded by other rural properties, they were in fact familiar with the area. This conclusory allegation alone, however, does not create a genuine dispute of fact as to whether the Responding Deputies were personally familiar with the terrain behind Ms. Ridley's house. Bogle also argues that it was not reasonable for the Responding Deputies to think that Bogle was familiar with the area, because he did not live there. Mr. Ottis, however, had stated that Bogle was "staying" there, which is enough to imply a familiarity. Bogle himself states numerous times that he worked in the area behind Ms. Ridley's home "every day."

important question is not Bogle's subjective intent. Rather, the Court looks at the perspective of a reasonable officer on the scene. The Responding Deputies had been on the scene for some time, speaking with Ms. Ridley and examining the surrounding area. Bogle had not made himself known, even though Ms. Ridley's neighbors informed the Responding Deputies that they had just seen Bogle a few minutes before the Responding Deputies arrived. Bogle does not dispute that he did not communicate with the Responding Deputies and that he was located in an area where it would be difficult to find someone. Additionally, Mr. Ottis informed the Responding Deputies that Bogle had failed to report to Mr. Ottis as required, and that Bogle had said "If I go to prison, I'll die." Furthermore, Robinson spotted Bogle in the woods, moving away from the Responding Deputies, although Bogle claims it would have been impossible for Robinson to see into the area where Bogle was. Regardless of whether Robinson could see Bogle moving away, there was sufficient information for the Responding Deputies reasonably to conclude that Bogle was at least hiding, if not actively evading arrest.

Courts may also consider the availability of other means of effectuating an arrest, *Smith*, 394 F.3d at 703, and this element is particularly relevant in the case at hand. The Responding Deputies' decision to use a canine to search for Bogle was made largely because of the terrain in which they were operating. Bogle does not dispute the characterization of the area—both sides agree that it was rural and densely wooded, with thick underbrush and steep ravines, making it difficult to navigate. The Responding Deputies decided that the safest and most effective way to locate Bogle would be to use canines, which are better able to maneuver steep terrain with dense vegetation and have a sense of smell that allows them to locate someone who is not visible.

Another relevant factor to the excessive force analysis is whether there was any warning given. According to the Responding Deputies, Robinson gave a warning to Bogle when she spotted him in the ravine below her. Bogle insists that neither Robinson, nor anyone else, gave a warning that Bogle might be bitten if he did not surrender, at least before the first canine bite he sustained. He also insists, however, that he was too far away to have heard such a warning—while also acknowledging that he faintly heard a woman's voice say his name, "Tracey." Ms. Ridley stated generally in her declaration dated June 4, 2017, that she was near the Responding Deputies "most of the time" and she did not hear them give a warning to Bogle. ECF 198-3 at 36, ¶ 11. She also indicated that she believed she would have heard an announcement, had one been given. *Id.* ¶ 12. But Ms. Ridley specifically testified in detail at her deposition of December 9, 2015, that she was in her house for much of the time the Responding Deputies were outside searching for Bogle; that she closed her doors to keep her dogs inside; that her windows were also closed; that she did not "even know where [the Responding Deputies] went"; that she thinks they may have damaged a fence (which she did not discover until the next day); that she "could not hear what they were saying"; that she "didn't see them in the back of the property looking . . . didn't see any of that"; that they could have been talking outside; and that she spent approximately five minutes on the telephone talking to a friend, "hysterical" and "crying." ECF 198-1 at 291-303 (Depo Tr. 34-46). Therefore, Bogle has not put forward evidence that genuinely disputes Defendants' evidence that Robinson gave a canine warning.

Ninth Circuit case law supports the conclusion that the Clackamas County deputies used a reasonable amount of force to effectuate Bogle's arrest. In *Smith v. City of Hemet*, a woman called the police and said that her husband was hitting or otherwise becoming physical with her. She told police that he did not have a weapon. 394 F.3d at 693. When officers arrived on scene

Smith did not obey officers' commands to take his hands out of his pockets. At some point, officers told him that a canine might be sent to subdue him. Then, officers sprayed Smith with pepper spray, and Smith attempted to go back inside his home. Officers then grabbed Smith and threw him down on the porch. At that point, an officer ordered a canine to attack him. Officers were still unable to secure both of his arms, and officers ordered the canine to bite Smith again. The officers then ordered the dog to release Smith, and proceeded to drag him off of his porch. At that point, Smith was shielding one of his arms from the dog, and the officers ordered the dog to bite Smith a third time. During this encounter, the officers also used pepper spray on Smith as many as four times; two of these instances were after the canine had held onto him, and one was after officers had already pinned him to the ground. *Id.*at 693-94.

The Ninth Circuit found that Smith's claim for excessive force should survive summary judgment. The court explained that the record revealed no "basis for believing that Smith was armed or that he posed an immediate threat to anyone's safety"; that Smith "was in plain view of the officers"; and that "[a]lthough he initially refused to comply with [the officer's] instruction to remove his hands from his pajama pockets, he ultimately did so before the officers used any physical force to restrain him." *Id* at 702. Additionally, the defendants had "concede[d] in their depositions that Smith did not pose a significant threat of death or serious injury." *Id*. When officers arrived, Smith was standing on his porch, separated from his wife, with no weapons in his possession. Although Smith ignored officers' requests to reveal his hands, he "did not attempt to run from the officers," and "did not attack the officers or their dog." *Id.* Finally, Smith had offered in evidence an expert opinion concluding that officers could and should have used an alternate means of restraining Smith.

The Ninth Circuit found to the contrary in *Miller v. Clark County*. 340 F.3d 959 (9th Cir. 2003). Miller refused to stop his car when a deputy attempted to pull him over, and the deputy called for backup while pursuing a passenger who had fled from the car. Miller then parked at his parents' home. Deputies learned that Miller was wanted for a felony charge of "attempting to flee from police by driving a car with a wanton or willful disregard for the lives of others." *Id*. at 960. Deputies were told that the residents in the home were not "law enforcement friendly," and that a mentally ill person lived there. *Id*. One deputy reporting to the scene learned that Miller had run away from the house a few minutes earlier, and saw a knife on the seat of the car that Miller had left behind. Miller was on a large, rural property, and deputies pursuing him ultimately ended up at a location with "dense, dark, wooded terrain." *Id*. at 961. After giving a canine warning, the deputies released the dog off-leash, and the dog located and bit Miller. Upon hearing Miller's scream, the deputies tracked him down, called the dog off of him, and arrested him. Miller suffered severe injuries from the bite and had to undergo surgery and spend several days in the hospital recovering. The court noted that the canine bite lasted for an "unusually long time period," as it took some time for deputies to make their way to Miller in the woods. *Id*. at 964. Miller filed a § 1983 action alleging excessive force.

In reviewing the case, the Ninth Circuit first found that the use of the canine did not constitute deadly force because the use of the police canine in this case was not "reasonably likely to kill." *Id*. at 962. The court then affirmed the district court's finding, after a bench trial, that the use of the canine did not constitute excessive force. In affirming this decision, the court first noted that Miller was wanted for a felony crime. Second, the court explained, the deputy on scene had reason to fear for her safety, because Miller had defied orders to stop, he was wanted for a crime of fleeing from police in a dangerous manner, and he had possessed a knife only

moments before, a fact which the court noted "suggests . . . a propensity to carry a weapon." *Id.* at 965. More importantly, the court added, the deputy knew that Miller had a "strategic advantage over the deputies," because he was hiding in the woods on treacherous terrain with which he—but not the deputy—was familiar. Finally, the court noted, Miller was "still evading arrest by flight," even though he had paused to hide in the woods. *Id.* at 966.

Based on all of these factors, the Ninth Circuit concluded that the deputy's decision to command the dog to bite and hold Miller "was reasonably necessary under the circumstances." *Id.* As the court explained, "a trained police dog could be trusted to neutralize the many strategic advantages that Miller had obtained by crouching in the darkness in a remote and unbounded landscape familiar only to Miller and treacherous to others who might enter." *Id.* at 967. The deputy "knew of the keen nose, acute vision, stealthy speed, natural courage, and lupine strength" of the canine. *Id.* And, the deputy knew that the canine "was trained to find, seize, and hold Miller, careful not to hurt Miller more than necessary." *Id.*

The facts of this case are similar to *Miller* and distinguishable from *Smith*. Accordingly, based on the totality of the circumstances, it was reasonable for the Responding Deputies to deploy a canine to locate Bogle in the steep, wooded area where Bogle was located. Thus, the first bite that Bogle sustained did not constitute an unreasonable use of force in effecting an arrest.

### b. Second Canine Bite

The second canine bite presents a different question. Again, the Court views the facts of this encounter in the light most favorable to Bogle. As Bogle describes the encounter, after falling down into the low creek area, he found himself standing about twenty feet away from McGlothin. McGlothin pulled his weapon and yelled something to the effect of: "freeze or I'll release another dog." Bogle asked McGlothin whether the deputy was after Bogle because of his

parole violation. McGlothin immediately gave a command to his canine, which bit Bogle in the arm. Bogle tried to resist the canine, while telling McGlothin that Bogle was not a threat to the deputy. McGlothin told Bogle to get down, and Bogle got down onto his knees. As the dog continued to hold onto Bogle's arm, McGlothin continued to order Bogle to get down further, but Bogle said that he could not because if he got down he would be under water in the creek. McGlothin then called the canine off of Bogle, and placed Bogle in handcuffs.

It is not entirely clear how long this second canine attack lasted. Bogle characterizes it as a matter of a few minutes. The canine first bit Bogle's forearm, and then, as Bogle resisted, moved its way further up his body, biting his back and eventually holding onto his upper arm. Bogle had several lacerations in his arm and back as a result of the bite. None was treated with stitches. In determining the reasonableness of this second canine attack, the Court again considers the totality of the circumstances, starting with the three factors from *Graham v. Connor*. As discussed above, the first factor, the crime for which Bogle was sought, tilts slightly in favor of the Defendants.

The second factor, the danger posed to the officer, still weighs in favor of McGlothin, but only slightly. Bogle does not dispute that before the canine bit him, he had not put his arms up and he had not gotten down on the ground. Even after the dog bit him, he did not fully comply with McGlothin's orders to get all the way down, although Bogle did explain his reasoning to the deputy. At the point that McGlothin commanded the dog, Bogle still had not been searched for weapons, McGlothin's fellow deputies had not yet caught up with the two of them, and Bogle still had the advantage of familiarity with the area and the possibility of using hidden weapons. But, Bogle was communicating with McGlothin at this point, and asking McGlothin what he was there for—which is not threatening behavior. The risk to McGlothin in this situation was less

than that to the officers before locating Bogle, as they previously had no idea what they might encounter.

The third factor, whether the suspect is resisting or evading arrest, weighs against McGlothin with respect to this canine attack. Bogle claims that, after he and McGlothin saw each other, Bogle did not run or hide from McGlothin, but rather asked why he was there. Although the Responding Deputies had been searching for quite a while, at the point that McGlothin commanded his canine to bite Bogle, Bogle was not evading the deputy.

The additional factors of alternate means and warnings are again relevant. With respect to this second bite, Bogle does not dispute that there was a clear warning given—McGlothin shouted something to the effect of "freeze or I'll release another dog." The alternative means analysis as to the second bite differs from that of the first bite. From the Responding Deputies' location behind Ms. Ridley's property, they faced an unknown terrain, a steep drop-off, and uncertainty with respect to Bogle's whereabouts. The Responding Deputies knew that canines would be better able to maneuver and would be able to find Bogle even if he was concealed. They determined that lesser force, such as pepper spray, a taser, or hand-to-hand combat, would be ineffective if Bogle took cover. Additionally, the canines were trained to bite and hold a suspect just long enough for an officer to find and locate the suspect. But here, McGlothin had already located Bogle. Other officers were not too far behind him, as they arrived around the time that Bogle was being put into handcuffs. Bogle was not actively running away from McGlothin, and McGlothin could potentially have tried other available means to secure Bogle's arrest.

Based on this analysis, the Court concludes that a reasonable jury could find that McGlothin used excessive force when he commanded his canine to bite Bogle, when Bogle and

McGlothin were standing about twenty feet away from each other, were communicating, and when Bogle was not explicitly threatening the deputy or running away from him. Although Defendants dispute the facts of this encounter as recited by Bogle, this merely creates an issue of fact for a jury to determine.

## 2. Bogle's Encounter with Robinson

Bogle claims that Robinson used unreasonable force by kicking or pushing him in the back during his arrest. It is undisputed that Robinson did exert some force on Bogle's back, but the timing and severity of that force is both disputed by the parties and presented in a contradictory manner by Bogle himself.[11]

There are two contradictions in Bogle's representations of his encounter with Robinson that are relevant to the Court's analysis of this claim. First, Bogle's sworn deposition testimony was that Robinson did nothing more than kick Bogle in the back. Bogle's response pleading asserts that Robinson also tried to force Bogle's head under water.[12] Second, his deposition testimony is that this encounter with Robinson took place *before* Bogle was handcuffed, while his response pleading asserts that she kicked him only *after* he was handcuffed. The Court must determine which version of Bogle's story to treat as true for purposes of this motion.

In his complaint, Bogle alleges that Robinson "used force on his back and neck to push him down with her knee on his lower back." Bogle testified in his November 17, 2015, deposition that Robinson "pushed [him] down under the water with her knee." When asked at

---

[11] Robinson and the other Responding Deputies on the scene maintain that it was Robinson who placed Bogle in handcuffs, and that she used her knee on his back in order to restrain him while placing him in handcuffs. Bogle, on the other hand, asserts that McGlothin placed Bogle into handcuffs, although Bogle agrees that it was Robinson who exerted force upon his back.

[12] Because Bogle submits his response pleading under oath, the Court interprets it as a declaration and accepts the representations within it, if otherwise admissible, as evidence.

deposition whether, at any point, any of the Responding Deputies pushed his head under the water, Bogle responded that they had not, though Bogle said that he "was keeping [his] head up." In his December 8, 2015, deposition, Bogle was asked specifically about his interaction with Robinson. After stating that Robinson kicked him in the back, Bogle was asked whether Robinson used any other physical force against Bogle, and he stated that Robinson did not. Additionally, in his November 17, 2015, deposition, Bogle was asked "what happened after the dog released," and he responded "I got kicked in the back." He was then asked: "After they pushed you down into the creek, what happened?" Bogle responded: "They put cuffs on me."

In his response to the Defendants' motion for summary judgment, however, Bogle tells a different story. At one point he explains that, after the dog was called off of him, McGlothin placed cuffs on him, and "at this time Deputy Hillary [sic] Robinson slammed her knee into the plaintiff's back and proceeded to kick and assault him with her knee into the creek." Later in his response, Bogle states that only after he was "already faced down and cuffed on his knees" and submitting to the officers' requests did "Robinson attempt[] to push the plaintiffs [sic] head under the water, but the plaintiff kept his head up."

In this circuit, the "general rule . . . is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)). This rule "should be applied with caution, because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id* (quotation marks omitted). In order for this rule to apply, a "district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's

deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id* (quotation marks omitted); *see also Van Asdale*, 577 F.3d 989 at 998-99.

While being deposed, Bogle was asked quite specifically about his interaction with Robinson. Bogle clearly stated that Robinson used her knee to push Bogle down before he was handcuffed. Bogle also admitted that, while he was on his knees, McGlothin continued to tell Bogle to get down further, and Bogle refused to do so. Bogle indicated that this was because he would be under water if he got down any further. He ultimately did get all the way down, however, and stated in his deposition that his head was not under the water.

Bogle's sworn statement submitted with his summary judgment response is that Robinson pushed him down *after* he was already handcuffed, and that she also attempted to force his head down into the water. This statement clearly and unambiguously contradicts Bogle's prior sworn testimony. The Court finds this statement to be a sham and disregards it for purposes of considering the pending motion. The Court proceeds by assuming that Robinson kicked or kneed Bogle in the back before he was placed in handcuffs, and that Robinson did not then push Bogle's head down into the water after Bogle was handcuffed.

Based on those facts, the force that Robinson exerted upon Bogle was not excessive. Robinson used her knee or leg in Bogle's back in order to restrain him while he was admittedly refusing to obey McGlothin's orders. Based on all of the factors described above, it was reasonable for the Responding Deputies to fear for their safety and to fear that Bogle would continue to evade arrest. As the Supreme Court has stated, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation and quotation marks omitted). It was

reasonable under these circumstances for Robinson to use this level of force against Bogle in order to secure his arrest.

### 3. Conclusion

Bogle presents a genuine issue of fact only with regard to whether the force used against him during the second dog bite was excessive. Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's claims against O'Neil and Robinson.

## C. Personal Liability of Sheriff Craig Roberts

Plaintiff seeks to hold Craig Roberts, the sheriff of Clackamas County, personally liable under § 1983. Sheriff Roberts' liability depends upon Bogle's constitutional rights having been violated by one of the Responding Deputies. *See Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) ("As Officer Chew's superior, Chief Samuels can be held liable in his individual capacity if he participated in the deprivation of Watkins' constitutional rights. Chief Samuels' liability depends upon a jury finding Officer Chew used excessive force against Watkins." (citation omitted)). Because the Court has only found a material dispute of fact relating to Bogle's second dog bite, Sheriff Roberts can only be personally liable with respect to McGlothin's actions. If McGlothin used excessive force, then Sheriff Roberts' "liability hinges on whether he set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Id*. (quotation marks omitted). He "can be held liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) (quotation marks and correction omitted).

In *Watkins*, the plaintiff sued under § 1983 for damages he sustained from a police canine during his arrest, and sought to hold the supervising police chief liable in addition to the officer on the scene. Watkins presented evidence that the chief signed off on an internal affairs report dismissing Watkins' complaint "despite evidence of [the officer's] use of excessive force . . . and . . . involvement in other police dog bite incidents, and apparently without ascertaining whether the circumstances of those cases required some ameliorative action to avoid or reduce serious injuries to individuals from dogs biting them." *Watkins*, 145 F.3d at 1093. The Ninth Circuit noted that the chief could be held liable for ratifying the officer's use of force and affirmed the district court's denial of summary judgment.

Similarly, in *Blankenhorn*, there was evidence that the chief of police "approve[d the officer's] personnel evaluations despite repeated and serious complaints against him for use of excessive force," as well as testimony "regarding the ineffectiveness of [the officer's] discipline for those complaints." 485 F.3d at 486. In that case, the Ninth Circuit found that the evidence "could lead a rational factfinder to conclude that [the chief] knowingly condoned and ratified actions by [the officer] that he reasonably should have known would cause constitutional injuries" like those alleged by the plaintiff. *Id.*

Although McGlothin was involved in several of the use of force incidents that Bogle has presented as exhibits, Bogle cites to no evidence in the record showing that Sheriff Roberts signed off on any reports dismissing use of force complaints against McGlothin, personnel evaluations supporting McGlothin despite numerous force complaints, or other similar evidence suggesting a history of unconstitutional excessive force by McGlothin that Sheriff Roberts ignored or ratified. Bogle suggests several times, in a conclusory manner, that Sheriff Roberts approved or ratified the use of force against Bogle. He has no personal knowledge of this fact,

however, and points to no evidence that corroborates this claim. In fact, Sheriff Roberts stated in his declaration that he became aware of the use of force against Bogle only after Bogle initiated this lawsuit. ECF 130 at 1.

Bogle also generally asserts that Sheriff Roberts is responsible for instructing officers to use an unconstitutional policy or practice regarding canine use of force. As discussed below, the Court finds insufficient evidence to support Bogle's argument that the CCSO policy is unconstitutional on its face or by custom, and therefore this theory of liability against Sheriff Roberts also fails. Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's claims against Sheriff Roberts.

**D. Qualified Immunity**

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts. And reasonableness of official action, in turn, must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1866 (2017) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982); then quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (alteration in original) (citation omitted)). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (emphasis in original) (quotation marks omitted). For this reason, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

In *Saucier*, the Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id*. The second step is to determine "whether the right was clearly established." *Id*. The constitutional issue, however, need not be addressed first in every case. *Pearson*, 555 U.S. at 227. When considering whether qualified immunity applies, the court must resolve all factual disputes in favor of the party asserting the injury. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013).

### 1. Constitutional Right

As previously discussed, Bogle has demonstrated that a genuine issue of material fact exists regarding whether the second dog bite constituted excessive force. Thus, a reasonable jury could conclude that McGlothin violated Bogle's Fourth Amendment rights.

### 2. Clearly Established

To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Ziglar*, 137 S. Ct. at 1867 (quoting *Saucier*, 533 U.S. at 202). To be clearly established, "[i]t is not necessary . . . that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent." *Id.* at 1866-67 (citations and quotation marks omitted). Courts should not "define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Rather, a court must look at "whether the violative nature of *particular* conduct is clearly established"—an analysis that is "undertaken in light of the specific context of the case." *Id*. (emphasis in original) (citations omitted). This high level of specificity is in fact "especially important in the Fourth Amendment context, where . . . it is sometimes

difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id* (citation, quotation marks, and correction omitted).

Finally, even if a right was violated, and that right was clearly established at the time, where an officer's mistake as to the law's requirements was *reasonable*, "the officer is entitled to the immunity defense." *Blankenhorn*, 485 F.3d at 471; *see also Saucier*, 533 U.S. at 202. In effect, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar*, 137 S. Ct. at 1867 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As the Ninth Circuit recently reaffirmed, "[w]e begin our inquiry into whether this constitutional violation was clearly established by defining the law at issue in a concrete, particularized manner." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). "Defined at an appropriate level of specificity," *see id.*, the question in this case is whether a deputy violates clearly established law when he commands a police canine to bite and hold a suspect until that suspect begins to obey his commands or otherwise indicates he intends to surrender when that suspect has a felony warrant out for his arrest, has not been searched for weapons, has evaded a police search for more than one hour, and is not surrendering or obeying the officer's instructions. The answer is that the deputy does not violate clearly established law under these circumstances.

In order to find a violation of clearly established law, the Court must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Bogle "bears the burden of showing that the rights allegedly violated were clearly established." *Shafer*, 868 F.3d at 1118. In *Shafer*,

the Ninth Circuit, faced with a qualified immunity claim in an unreasonable force case, noted

that Shafer had cited "four cases with comparable degrees of force used by officers, but none of

which involved a challenging environment or an act of physical resistance or obstruction by the

arrestee." *Id.* at 1117. Similarly, Bogle cites to several cases, but none is sufficiently factually

similar to find clearly established law on the situation that McGlothin faced.

      Additionally, even if McGlothin was mistaken about the reasonableness of his actions, it

would have been a reasonable mistake. This is not the sort of "plainly incompetent" or

"knowing" violation of the law that is unprotected by the qualified immunity doctrine. The

existing case law regarding use of police dogs does not provide enough clarity to conclude that

"*every* reasonable official would have understood . . . *beyond debate*" that their actions violated

the law. *Shafer*, 868 F.3d at 1118 (emphasis and alterations in original) (quotation marks

omitted). Because McGlothin "objectively could have believed that his conduct was lawful," he

is entitled to qualified immunity. *See Watkins*, 145 F.3d at 1092. Accordingly, summary

judgment is granted on Plaintiff's claims against McGlothin.

**E.  *Monell* Claim against Clackamas County**

      Bogle also alleges a *Monell* violation against Clackamas County.[13] Local governments

may be held liable under § 1983 "if the governmental body itself subjects a person to a

deprivation of rights or causes a person to be subjected to such deprivation." *Connick v.

Thompson*, 563 U.S. 51, 60 (2011) (quotation marks omitted). But this is not a doctrine of

vicarious liability—local governments "are responsible only for 'their *own* illegal acts.'" *Id*.

(quoting *Pembaur v. Cincinnatti*, 475 U.S. 469, 479 (1986). Therefore, one who seeks to hold a

---

[13] *Monell* claims arise from *Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

local government liable under § 1983 must show that "action pursuant to official municipal policy caused their injury." *Id.* (quotation marks omitted).

Because the Court finds no underlying constitutional violation with respect to the decision to use canines to search for Bogle, Bogle's first canine bite, or Robinson's use of force against Bogle, the Court need not address the county's liability for those actions. Because there is a triable issue of fact with respect to Bogle's second canine bite, however, the Court examines whether Bogle has established a genuine dispute of material fact relating to Clackamas County's liability for Bogle's second canine bite.[14]

As the Ninth Circuit recently explained, "[t]he 'first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016), *cert. denied sub nom. Los Angeles Cty., Cal. v. Castro*, 137 S. Ct. 831 (2017) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). A municipal policy may be established by showing one of three things: (1) a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity"; (2) that "the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision"; or (3) "an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002) (citations and quotation marks omitted).

---

[14] Unlike individuals, "municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993).

"A custom or practice can be inferred from evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015) (alterations omitted) (quoting *Hunter v. Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011)). For example, "[e]vidence of identical incidents to that alleged by the plaintiff may establish that a municipality was put on notice of its agents' unconstitutional actions." *Id*. at 1027 (quotation marks and alteration omitted). Similarly, "general evidence of departmental treatment of complaints and of the use of force can support the plaintiff's theory that disciplinary and complaint processes contributed to the police excesses complained of because the procedures made clear to the officer that he could get away with anything." *Id*. (alterations and quotation marks omitted). "The custom or policy must be a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Castro*, 833 F.3d at 1075 (alteration in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)).

When an allegation is based not on a formal policy but on a *custom*, in order to support a *Monell* claim such "custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)). "[L]iability for improper custom may not be predicated on isolated or sporadic incidents." *Id*. at 1233 (quoting *Trevino*, 99 F.3d at 918).

In addition to "identify[ing] a custom or policy, attributable to the municipality, that caused his injury," Bogle must "demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of'" those with whom the deputies interact. *Id.*

(quoting *City of Canton*, 489 U.S. at 385). The deliberate indifference standard is an objective

one. *Castro*, 833 F.3d at 1076 (noting that "an objective standard applies" to deliberate

indifference, and overruling other cases to the extent they suggest otherwise). Deliberate

indifference occurs when the need for "different action 'is so obvious, and the inadequacy [of the

current procedure] so likely to result in the violation of constitutional rights, that the

policymakers can reasonably be said to have been deliberately indifferent to the need.'" *Oviatt v.*

*Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992) (quoting *City of Canton*, 489 U.S. at 390).

Finally, the custom or practice must be the "'moving force' behind the constitutional violation."

*Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994) (quoting *Monell*, 436 U.S. at 694).

      In his complaint, Bogle asserts two alternate theories of *Monell* liability. First, he alleges

that Sheriff Roberts ratified the use of excessive force on Bogle. He alternatively alleges that

CCSO has a custom or practice of using canines in a manner that amounts to excessive force. In

his response to Defendants' motion for summary judgment, Bogle also argues that the

Clackamas County canine use of force policy is unconstitutional on its face and that Sheriff

Roberts is liable for failure to train, failure to discipline, and for instructing deputies using an

unconstitutional policy.[15] Although Bogle's complaint does not specifically allege a facially

unlawful canine policy,[16] because a court must liberally construe the filings of a *pro se* plaintiff

and afford the plaintiff the benefit of any reasonable doubt, *Hebbe v. Pliler*, 627 F.3d 338, 342

---

[15] Defendants claim that Bogle does not, in his sur-response to their motion, argue that the canine policy is facially unconstitutional. But Bogle does make this argument at numerous points in his initial response. ECF 198 at 131, 134, 140, 146, 148.

[16] In his sur-response, requested by the Court, Bogle attempts to "clarify" his asserted claims against Clackamas County through a declaration. But summary judgment is not the time to supplement a complaint.

(9th Cir. 2010), the Court addresses Bogle's argument that Clackamas County maintains a facially invalid canine policy.

### 1. Sheriff Roberts' Ratification

As to Bogle's first theory, as discussed above, Bogle has presented no evidence to create a genuine dispute of fact as to Sheriff Roberts' ratification or approval of the incident involving Bogle. The Ninth Circuit articulated the standard for a *Monell* claim based on ratification in *Lytle v. Carl*:

> To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it. The policymaker must have knowledge of the constitutional violation and actually approve of it. A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim.

382 F.3d 978, 987 (9th Cir. 2004) (citations and quotation marks omitted).

Bogle simply asserts, in a conclusory fashion, that because no disciplinary action was taken against the officers involved in his arrest, Sheriff Roberts personally ratified their actions. Sheriff Roberts stated in a sworn declaration that he only became aware of the incident involving Bogle after Bogle filed this lawsuit. Bogle has presented no evidence to the contrary. Therefore, there is no genuine dispute of material fact as to whether Sheriff Roberts ratified the use of force on Bogle.

### 2. Unlawful Custom or Practice

Bogle argues generally that Clackamas County has a custom of using unconstitutional force on individuals who are not presenting any immediate threat and are not wanted for serious crimes. ECF 198 at 157. Bogle's Complaint purports to base his allegation of an unlawful custom or practice on "prior tort claims and actions against" the County. Bogle's Complaint cites only one such prior case, *Millican v. Clackamas County*. *See* ECF 132-4. The claim in that case,

however, was for negligence, rather than excessive force, and involved a bystander injured by a

canine during a search for a suspect. ECF 132-4. In Bogle's response to Defendants' motion for

summary judgment, he also discusses *Kaady v. City of Sandy*, a case alleging excessive force

after a man was shot and killed by officers of the City of Sandy and Clackamas County. 2008

WL 5111101 (D. Or. Nov. 26, 2008). Bogle argues that these two prior actions against

Clackamas County indicate ratification of an unlawful policy. But neither of these cases relates

to what Bogle here alleges—a custom of using canines in an unconstitutional manner.

In his response in opposition to Defendants' motion for summary judgment, Bogle also

attaches as exhibits copies of CCSO use of force reports, totaling over 700 pages.[17] *See generally*

ECF 198-4, 198-5, 198-6. Bogle relies on these documents to argue that CCSO has a practice of

using "extreme" canine force on suspects who are not presenting a threat to deputies, who are not

wanted for serious offenses, and who are "hiding passively," rather than actively resisting arrest.

Bogle argues that this custom or practice runs contrary to the constitutional requirements in

*Graham* and other cases. Bogle directs the Court's attention to several specific incidents in his

response to the motion for summary judgment. The Court has reviewed the reports of these

incidents and discusses those incidents below. The Court has also generally reviewed the other

use of force reports attached as Bogle's exhibits.

Contrary to Bogle's general assertion that the use of force reports indicates a pervasive

practice of using force against individuals who are only "hiding passively," several of the

incidents that Bogle points the Court to involved suspects who were actively evading or running

---

[17] Interspersed among these exhibits is commentary by Bogle on individual use of force incidents. The Court considers these not as factual descriptions of what occurred in each incident, but as argument by Bogle.

from police.[18] In some cases, suspects were posing a clear threat to deputies.[19] In at least two of

the incidents that Bogle cites, the suspects attacked or began to attack deputies. In one, the

suspect lunged toward deputies. ECF 198-4 at 4-23.[20] In another, the suspect had fired shots at a

police car shortly before a canine was deployed to find him. ECF 198-6 at 209.[21]

---

[18] Bogle cites incident No. 14-23886, though he seems to do so only to note that deputies
have "PA" systems available to them. Regardless, this incident involved a suspect who had a
history of being armed, was in a stolen vehicle, and was actively running from police. ECF 198-5
at 84-92.

Bogle also draws the Court's attention to incident No. GO 10 2015-31645. In that
incident the suspect, who had a "caution" felony warrant out, was bitten by a police canine after
having run from police, jumped from a window, continued to run, and begun to climb a fence.
ECF 198-6 at 227-249.

Similarly, Bogle references incident No. 10 2015-33116. In this case, the suspect had a
warrant out for his arrest and ran from deputies while deputies were attempting to place him in
handcuffs. ECF 198-5 at 22-37.

[19] Bogle cites incident No. GO 10 2016-18123 as an example where canines bit a man
who was already compliant. ECF 198 at 47. But shortly before deputies used canines to take the
man into custody, the man was making homicidal and suicidal statements and had threatened to
shoot the first deputy that he saw. He brandished a firearm. Although he eventually lowered his
firearm to the ground, at the time a canine was released on him, he was not complying with the
deputies' orders to put his hands in the air. The deputy who released the canine did so when the
man was hunched over, and the man hands were out of the deputy's view. ECF 198-4 at 173-
104.

[20] In incident No. GO 10 2016-32897, deputies responded to a domestic disturbance
involving a man who was speaking unintelligibly, had a history of resisting arrest and interfering
with or eluding police, and was refusing to comply with deputies. The man lunged toward a
deputy, and at that moment one deputy deployed a taser while another deployed a canine, which
was called off once the man was subdued. ECF 198-4 at 2-23.

[21]Bogle seems to cite incident No. 14-2085 simply for the proposition that deputies have
at their disposal means of force that are less severe than canines. ECF 198 at 182. To the extent
that Bogle relies on it to establish a custom of using canines in a manner that constitutes
unreasonable force, this incident does not support his argument. In that incident, the individual
was actively fleeing from police and had fired shots at a police car shortly before a canine was
sent in to find him. ECF 198-6 at 209.

Bogle cites Incident No. 15-6824, but provides only disjointed portions of the use of force report, which include little background information on that incident. The information available indicates that the suspect had evaded a police car and was refusing to cooperate with police, and that deputies first attempted to use pepper spray to take the individual into custody, to no avail. ECF 198-4 at 130-75. Bogle also cites incident No. GO 10 2015-12288, in which the suspect had a history of attempting to elude police, resisting arrest, and unlawful possession of a firearm and possession of knives. There was a felony parole violation warrant out for his arrest. The suspect was hidden from deputies, who were worried that he was lying in wait; the deputies determined that a canine was the safest method to use to secure this individual's compliance. ECF 198-4 at 176-89. Finally, Bogle relies on Incident No. GO 10 2016-4112 to suggest that Clackamas County has a practice of using intimidation to receive permission to search properties. ECF 198 at 44. This argument is unrelated to Bogle's allegation of an unlawful practice of deploying canines.

Each of the incidents that Bogle cites to—and every use of police force—presents a unique set of facts, and the reasonableness of any given use of force depends upon all surrounding circumstances. The use of force reports that Bogle has submitted are insufficient to create a genuine dispute of material fact as to whether Clackamas County has a custom or practice of using police canines in an unconstitutional manner.

Bogle argues that his exhibits show that "in most case where the canines are deployed off leash that the majority of suspects are bitten." But Bogle has provided no evidence that he has submitted reports of *all cases where canines were deployed off leash*, so there is no evidence to support this conclusory assertion. Defendants have provided some evidence as to the number of canine deployments, uses of force, and bites. Between January 1, 2014, and December 31, 2016,

there were 2,117 canine deployments by CCSO. Defendants provided an estimate that there were

about 468 "use of force incidents" out of these 2,117 deployments. The Court understands canine

"deployments" to refer to canines being taken out of a vehicle and onto a scene. ECF 198-1

at 80. Defendants have not defined "use of force incidents" for the Court, so these figures are

only marginally instructive. Defendants, however, do provide evidence that of those 2,117

deployments, there were 32 incidents in which a suspect was bitten by a canine. Bogle has

provided no evidence to support the assertion that this number of bites, or uses of force—and

specifically the number among those that constitute an unreasonable use of force in violation of

the Fourth Amendment—rises to the level of a custom that is "so persistent and widespread that

it constitutes a permanent and well settled city policy." *Hunter*, 652 F.3d at 1233 (quotation

marks omitted). The attached use of force reports alone do not create a genuine dispute of fact on

this point.

Further, Bogle has not provided evidence that the alleged "custom" of using

unconstitutional canine force "was adhered to with deliberate indifference to the constitutional

rights" of suspects, as required. *Castro*, 833 F.3d at 1076 (quotation marks omitted). As

discussed above, the use of force reports do not present a situation in which the need for

"different action is so obvious" that the failure to change practice can be characterized as

deliberate indifference. *Oviatt*, 954 F.2d at 1477-78 (quotation marks omitted). Nor has Bogle

provided any evidence that officers involved in any of the use of force incidents Bogle attaches

were not, in fact, disciplined or instructed to change their practices.

Because there is no genuine dispute of material fact as to whether Clackamas County

Sheriff's Department's use of canines amounts to a custom or practice of using force in violation

of the Fourth Amendment, this theory of *Monell* liability also fails.

### 3. Facially Unlawful Policy

Bogle argues that CCSO's canine policy is invalid on its face because it does not explicitly include the *Graham* factors for reasonableness. Bogle argues that the policy allows deputies to deploy multiple canines on hidden suspects who are unarmed, non-threatening, and not wanted for serious crimes, and that this constitutes a facially invalid policy. *See* ECF 198 at 131. Bogle argues that because the policy allows for the deployment of canines off leash to track down individuals suspected of a misdemeanor offense, it runs afoul of the requirements in *Graham*. Bogle also asserts that the policy is unconstitutional because, as he claims, it does not instruct handlers to look out for bystanders, and because canines are trained to bite any individual they encounter, rather than a particular individual. *See* ECF 198 at 143-44.

In order to pass constitutional muster, a policy need not expressly set out the three-part test from *Graham*, as Bogle argues. Bogle argues that the policy runs afoul of *Graham* because, in some cases, it allows for the deployment of canines to search for individuals suspected of a misdemeanor. This argument also misses the mark. *Graham* is a multi-factor test, so each factor need not be met in each case in order for an action to be constitutional. As the Court has explained, the constitutionality of the use of force depends on all the surrounding circumstances.

As articulated by the Supreme Court in *Salerno*, in the context of a challenge to the validity of a policy on its face, the party asserting invalidity must "show that 'no set of circumstances exists under which the policy would be valid.'" *Lanier v. City of Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (alteration omitted). The Ninth Circuit has explicitly declined to adopt a different standard. *S.D. Myers, Inc. v. City & Cty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001). The *Salerno* standard means that "a policy of general applicability is facially valid unless it can *never* be applied in a constitutional manner." *Lanier*, 518 F.3d at 1150 (emphasis in original).

Bogle has not alleged sufficient facts to create a genuine dispute of material fact regarding whether the Clackamas County canine use of force policy is unconstitutional on its face. The Court has concluded that the canine use of force policy was applied in a constitutional manner with respect to Bogle's first encounter with a police canine, and the Court need not look further than this. Because it is not the case that the policy "can never be applied on a constitutional manner," Bogle's facial invalidity argument fails.

## F. Additional Claims

Bogle raises several new claims in his response to Defendants' motion for summary judgment. He may not allege new claims in response to summary judgment. *See Wasco Prods., Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("'[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.'") (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)). Therefore, the Court does not consider any of the new claims, briefly discussed below, raised by Bogle in his summary judgment response.

Bogle claims that O'Neil and McGlothin breached a duty to Bogle "to control their [c]anines and keep them on leash while on elevated terrain," and that the failure to do so constituted gross negligence. He also claims that the deputies were negligent for deploying a canine with a "known brain disease that cause[s] aggression in canines." Bogle's complaint did not allege any negligence claims, however, and did not put the Defendants on notice of any such claim.

Bogle claims that the deputies destroyed part of Ms. Ridley's fence on her property during their search. He does not assert this claim in his complaint, however, and it is unrelated to the use of force in his arrest. Bogle also argues that he alleged a battery claim in his complaint and attempts to further argue the merits of that claim. No battery claim is alleged in the complaint.

Bogle also seems to assert several related claims suggesting an unreasonable search. He states that the deputies did not have a warrant to search Ms. Ridley's property and that the deputies lacked probable cause to "search and stop" Bogle. These claims are irrelevant, because the deputies had a warrant for Mr. Bogle's arrest, and Ms. Ridley admittedly granted the officers permission to search her property. Nor were such claims alleged in Bogle's complaint. Similarly, Bogle argues, and the Defendants do not dispute, that Bogle was not read his *Miranda* rights. The proper remedy for a *Miranda* violation, however, is the exclusionary rule, which is not relevant at this stage in the proceedings. Nor was such a claim alleged in his complaint.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.

**IT IS SO ORDERED**.

DATED this 15th day of November, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge